**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED CARGO MANAGEMENT, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CARLTON BLAIR III; WORLDLOG, LLC; DEBORAH PAGE; NEIL MYERS HOGAN HECK; JILLIAN STEINKRUGER; MARCO SAVINO MICHELLE ALLEN; JAN PARK; and NICOLETTE BERROUET,<br><br>Defendants.<br><br>WORLDLOG, LLC, and CARLTON W. BLAIR,<br><br>Plaintiffs<br><br>vs.<br><br>UNITED CARGO MANAGEMENT, INC.; THOMAS LEE; AND JEFF LEE,<br><br>Defendants | ) | **ORDER**<br><br>No. 2:25-cv-04196-DCN<br>No. 2:25-cv-04501-DCN |

This matter is before the court on defendants Deborah Page, Neil Myers, Hogan Heck, Jillian Steinkruger, Marco Savino, Michelle Allen, Jan Park, and Nicolette Berrouet's (collectively, the "Individual Defendants") motion to dismiss, ECF No. 85. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

Plaintiff United Cargo Management, Inc. ("UCM") is a global logistics company based in Los Angeles offering shipping and freight delivery services. ECF No. 64,

Amend Compl. ¶ 2. UCM maintains an office in Charleston, South Carolina. Id. ¶ 3. It brings this action against the Individual Defendants as well as co-defendants Carlton Blair III ("Blair") and his company, Worldlog, LLC ("Worldlog"). Id. ¶ 3. UCM alleges that Blair started Worldlog, a competing business, while Blair was still employed as general manager of UCM's Charleston office. Id. ¶ 4. In addition, Blair allegedly "worked against UCM's interests in an effort to steal UCM's Charleston division and other assets of UCM for himself." Id. When UCM discovered Worldlog's existence in April of 2025, Blair was promptly terminated. Id. ¶ 5. Shortly after Blair's termination, the Individual Defendants—former employees of UCM—resigned from UCM on April 30, 2025 to work for Blair at Worldlog, where they allegedly "continue assisting Blair in his efforts to steal UCM's business and property," including through efforts to convert "existing UCM customers away from UCM to Worldlog." Id. ¶¶ 5, 12–19, 144–52. These actions, according to UCM, placed the Individual Defendants in breach of non-solicitation agreements (the "Agreement(s)") they entered into with UCM. Id.

Seeking to enforce the Agreements, UCM brings claims for breach of contract against each of the Individual Defendants. Id. ¶¶ 144–52. UCM also asserts claims against the Individual Defendants for trademark infringement under the Lanham Act, 15 U.S.C. § 1114; violations of the Anti-Cyber Squatting Consumer Protection Act, 15 U.S.C. § 1125(d); theft of trade secrets; interference with contractual relations; intentional interference with prospective economic relations; conversion; common law fraud; and unfair trade practices.[1] Id. ¶¶ 78–117, 132–43, 161–99.

[1] UCM brings various claims against Blair and Worldlog as well, Amend. Compl. ¶¶ 78–160, but those claims are not discussed in this order.

This case was transferred to this district from the Central District of California pursuant to 28 U.S.C. § 1404(a) on May 16, 2025. ECF No. 36. The Central District of California found that this district was a more convenient venue and that a transfer was in the interest of justice. Id. at 12–14. Because the court determined that transfer was appropriate for the sake of convenience, it declined to rule on Blair and Worldlog's pending motion to dismiss for lack of personal jurisdiction. Id. at 12. The Individual Defendants, however, were only named as defendants after transfer to this district when UCM filed an amended complaint August 19, 2025. Compare ECF No. 1, Compl., with Amend. Compl.

On October 31, 2025, the Individual Defendants moved to dismiss UCM's amended complaint in its entirety or, alternatively, to dismiss UCM's common law fraud and breach of contract claims. ECF No. 85 at 3–5. The court held a hearing on the motion on January 8, 2026. ECF No. 91. The court granted the motion as to UCM's common law fraud claims in an order issued on February 23, 2026 (the "February Order").[2] ECF No. 92. The court deferred ruling on whether UCM's breach of contract claims were subject to dismissal and ordered supplemental briefing on the issue of whether the timing of the Individual Defendants' addition to this suit impacts the choice of law rules to be applied in assessing the breach of contract claims. Id. at 23–24. The Individual Defendants filed their supplemental briefing on March 16, 2026, arguing the court should apply California's choice of law rules. ECF No. 94. UCM responded on March 26, 2026, arguing the court should apply South Carolina's choice of law rules.

[2] In the February Order, the court also disposed of a motion dismiss filed by Blair and Worldlog.

ECF No. 95. The Individual Defendants filed a supplemental reply brief on April 2, 2026. ECF No. 96. As such, the Individual Defendants' motion to dismiss the breach of contract claims is fully briefed and now ripe for review.

## II. STANDARD

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

## III. DISCUSSION

The court first addresses the issue on which it ordered supplemental briefing: whether the Individual Defendants being added to this suit after a Section 1404(a) transfer impacts the choice of law rules applicable to UCM's breach of contract claims against them. After concluding that South Carolina's choice of law rules apply, the court will then determine which state's substantive contract law applies under a South Carolina choice of law analysis. Finding that the substantive law of South Carolina applies to the Agreements, the court then turns to the merits of the motion to dismiss. On the merits, the court finds that the Agreements are not conclusively unenforceable under South Carolina law. For that reason, the court denies the motion.

### A. Choice of Law Rules to be Applied

A federal court exercising diversity or supplemental jurisdiction over state law claims typically applies the choice of law rules of the state in which the court sits. ITCO Corp. v. Michelin Tire Corp., Comm. Div., 722 F.2d 42, 49 n.11 (4th Cir. 1983) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941)). An exception to this general rule arises when a case is transferred from one district court to another pursuant to 28 U.S.C. § 1404(a). In that case, "the transferee district court must . . . apply the state law that would have been applied if there had been no change of venue." Van Dusen v. Barrack, 376 U.S. 612, 639 (1964). Thus, a Section 1404(a) transfer typically results in a "change of courtrooms," but not a change of the substantive law to be applied. Id.

With Section 1404(a) transfers, the plaintiff has typically filed suit in a proper venue, so a transfer merely allows the action to be sited in a more convenient location.

Compare § 1404(a), with § 1406(a); see Van Dusen, 376 U.S. at 636–37 (characterizing Section 1404(a) as a "federal judicial housekeeping measure"). Applying the law of the plaintiff's initially chosen venue, therefore, affords the plaintiff "the benefit of the laws of the jurisdiction of which they availed themselves." Al Shimari v. CACI Intern., Inc., 933 F. Supp. 2d 793, 799 (E.D. Va. 2013); see also REC Software USA, Inc. v. Bamboo Solutions Corp., 2011 WL 13120813, at *2 (E.D. Va. Mar. 31, 2011) (noting that plaintiff's choice of forum is entitled to "substantial deference" in deciding a motion to transfer). Otherwise, if a transfer from a proper yet inconvenient venue resulted in a change in the applicable law, "the plaintiff's venue privilege and resulting state-law advantages could be defeated at the defendant's option." Ferens v. John Deere Co., 494 U.S. 516, 531 (1990). So, the Van Dusen rule preserves a plaintiff's venue privilege notwithstanding a transfer for the sake of convenience.

There are, however, exceptions to the Van Dusen exception. First, the Van Dusen rule does not apply when a case is transferred to cure a defect in venue pursuant to 28 U.S.C. § 1406(a). Myelle v. Am. Cyanamid Co., 57 F.3d 411, 413 (4th Cir. 1995). Section 1406(a) transfers often result when the transferor court determines that there is a defect in venue or that it lacks personal jurisdiction over a defendant. See Porter v. Groat, 840 F.2d 255, 257 (4th Cir. 1988) (adopting construction of Section 1406(a) that permits transfer for any "impediment to a decision on the merits" even for "some reason other than a mere lack of venue."). The transferee court then applies the choice of law rules of its forum state, just as it would had the case originally been filed there. See Myelle, 57 F.3d at 413; Klaxon, 313 U.S. at 496–97. This prevents a plaintiff from filing suit in an improper forum in order to capture the benefit of an advantageous law and

carry it to a proper forum through a transfer. LaVay Corp. v. Dominion Fed. Sav. & Loan Ass'n, 830 F.2d 522, 526 (4th Cir. 1987).

Second, the law of the transferee court applies after a Section 1404(a) transfer when the action could not have been maintained in the transferor court. See Davis v. Costa Gavras, 580 F. Supp. 1082, 1086 (S.D.N.Y. 1984). A Section 1404(a) transfer, in this circumstance, typically results from the transferee court declining to rule on a defendant's personal jurisdiction challenge, instead finding it expedient to transfer the case to a more convenient venue where personal jurisdiction over the defendant is more certain. See Gimer v. Jervey, 948 F.2d 1280 (Table), 1991 WL 237931, at *1 (4th Cir. 1991); Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc., 689 F.2d 982, 991 (11th Cir. 1982); Ellis v. Great Sw. Corp., 646 F.2d 1099, 1110 (5th Cir. 1981). If the transferee court determines that the transferor court could not have exercised personal jurisdiction over the defendant, the law of the transferee court's forum state applies. See Davis, 580 F. Supp. at 1086; cf. Ianello v. Busch Ent. Corp., 300 F. Supp. 2d 400, 403 (E.D. Va. 2004) (determining whether venue would have been proper in the transferor district when the transferor court declined to "rule[ ] on the propriety of venue," and had instead transferred the case pursuant to Section 1404(a)). As with Section 1406(a) transfers, this exception prevents a plaintiff from using a transfer to import the law of an improper forum to a proper one, see Davis, 580 F. Supp. at 1086, the only distinction being that the transferor court never determined whether a defect in venue or jurisdiction would prevent it from hearing the case.

While the foregoing authorities do not answer the question of which state's choice of law rules apply to defendants added after a transfer, a few district courts have had

occasion to address the issue. Two district courts have applied the choice of law rules of their own forum states to post-transfer defendants. Z-Rock Commc'ns Corp. v. William A. Exline, Inc., 2004 WL 1771569, *5–6 (N.D. Cal. Aug. 4, 2004); Ormond v. Anthem, Inc., 2009 WL 102539, at *5 (S.D. Ind. Jan. 12, 2009). Those courts relied on reasoning taken from a footnote in an earlier case that discussed the issue in dicta. Lombard v. Econ. Dev. Admin. Of P.R., 1995 WL 447651, at *2 n.1 (S.D.N.Y. Jul. 27, 1995). Another district court elected to apply the choice of law rules of the transferor court's forum state. Riddle v. Shell Oil Co., 764 F. Supp. 418, 423 (W.D. Va. 1990). The court discusses each case in turn.

**1. Cases Applying Law of Transferee Court's Forum State**

In Z-Rock, the plaintiffs initially brought suit in the Southern District of Florida; the case was then transferred to the Northern District of California pursuant to Section 1404(a). 2004 WL 1771569, at *4–5. After transfer, the plaintiffs amended their complaint to add two new defendants to the suit. Id. The post-transfer defendants argued that the law of the transferee court's forum state (California) should apply; the plaintiffs invoked the Van Dusen rule, arguing the law of the transferor court's forum state (Florida) should apply. Id. at *6.

The Z-Rock court noted that the Van Dusen rule was animated by concerns of defendants engaging in forum shopping. Id.; see also Van Dusen, 376 U.S. at 635 (If defendants received a "change of law as a bonus for a change of venue[,]" then parties "might well regard the section primarily as a forum shopping instrument."). There was "no concern" of the post-transfer defendants having shopped for a more favorable venue, the court explained, because they were simply asking the court to apply the law of the

state where they were first named as defendants—a fact over which they had no control. Z-Rock, 2004 WL 1771569, at *6 (noting that plaintiffs were "master[s] of their complaint," and "had the choice of selecting a forum for their original complaint and naming the parties" but neglected "to name the [post-transfer] defendants" while the case was still in Florida). So, the court reasoned that the plaintiffs had simply "failed to invoke application of Florida's choice-of-law rules to the [post-transfer] defendants" by waiting to amend their complaint until after transfer. Id. For the post-transfer defendants, the Northern District of California was "the original forum[,]" and so the court departed from Van Dusen and applied California choice of law rules on that basis. Id.

In Ormond, the plaintiffs initially filed suit in Ohio, and the case was then transferred to Southern District of Indiana, at which point the plaintiffs amended their complaint to add another defendant to the suit. 2009 WL 102539, at *4–5. The plaintiffs argued that, in accord with Van Dusen, Ohio law should apply to all defendants, even the one added after transfer. Id. at *4. The post-transfer defendant relied on Z-Rock to argue that Indiana was the original forum for claims against it. Id. at *5. The court adopted the reasoning of the Z-Rock court, finding that Indiana was the original venue for the later-added defendant (as opposed to Ohio) because plaintiffs had "initially filed their claims against [the post-transfer defendant] in Indiana." Id. Therefore, applying Indiana choice of law rules to claims against the post transfer defendant did not "frustrate the plaintiffs' ability to take advantage of the forum where they chose to file their claim." Id. The

court thus departed from Van Dusen and applied Indiana choice of law rules to the post transfer defendant.[3] Id.

Both the Z-Rock and Ormond courts relied on reasoning in a footnote from an order issued by the Southern District of New York. Lombard, 1995 WL 447651, at *2 n.1. In Lombard, the plaintiff initially filed suit in the Central District of California against several defendants before the case was transferred to the Southern District of New York pursuant to Section 1404(a). Id. at *1. Additional defendants were added to the suit after the transfer. Id. The plaintiff argued that California choice of law rules should apply, while the defendants argued for application of New York choice of law rules. Id. To resolve the issue, the court first recognized that it would need to address whether the Central District of California could have exercised personal jurisdiction over the defendants because the case was transferred before that determination was made. Id. But that analysis was unnecessary because both California's and New York's choice of law rules yielded the same substantive law to be applied. Id.

In a footnote, the court identified another issue unaddressed by the parties: "whether the personal jurisdiction determination must be made at all for those defendants that were added to the action only after the transfer to this Court." Id. at 2 n.1. "For those later-added parties," the court explained, "the original forum, at least arguably, [wa]s this court, not the transferor court, and [so], under Klaxon, New York conflicts rules [w]ould control." Id. (emphasis in original).

[3] The court notes that it was the plaintiffs in Z-Rock and Ormond that sought to apply the transferor law, while, in this case, UCM argues in favor of the transferee forum's law applying.

The Individual Defendants argue that, because "Z-Rock and Ormond merely parrot . . . unresolved dicta[ ]" from Lombard, none of the three cases provides any "persuasive authority for departing from the Van Dusen rule." ECF No. 94 at 3. In opposition, UCM submits that Z-Rock and Ormond are "directly analogous" and that their reliance on dicta from Lombard "does nothing to undermine" either court's holding. ECF No. 95 at 2.

**2. Case Applying Law of Transferor Court's Forum State**

The Individual Defendants urge the court to adopt the approach taken by the Western District of Viginia in Riddle. ECF No. 94 at 5–6. In that case, the suit arrived in the Western District of Virginia after a Section 1404(a) transfer from the Southern District of Mississippi, and a new defendant was added after transfer. Riddle, 764 F. Supp. at 420–21. The parties disputed which state's statute of limitations should apply to the plaintiff's claim. Id. The plaintiff claimed that Mississippi's longer statute of limitations was applicable, while the post-transfer defendant argued that Virginia's statute of limitations should govern because "Virginia [w]as the forum for plaintiff's suit against [it]." Id. at 423. To support this view, the post-transfer defendant cited decisions from federal courts of appeals holding that the transferee district court should apply the choice of law rules of its own forum when the transferor district court did not have personal jurisdiction over the defendant. Id. (first citing Ellis, 646 F.2d at 1110 (holding "that following a Section 1404(a) transfer from a district in which personal jurisdiction over the defendant could not be obtained, the transferee court must apply the choice of law rules of the state in which it sits[.]"), then citing Martin v. Stokes, 623 F.2d 469, 475 (6th Cir. 1980) (remanding to district court for determination as to whether transferor

court could have exercised personal jurisdiction over defendant, which would allow the transferor forum's law to apply)). The Riddle court reasoned that these cases were inapposite because the post-transfer defendant did not contest the plaintiff's assertion that the Southern District of Mississippi could have exercised personal jurisdiction over the post-transfer defendant had it been a party prior to transfer.[4] 764 F. Supp. at 423.

The court declined to apply Virginia law on two additional grounds. Id. First, the court reasoned that adopting this position would require a plaintiff "to go back to the court where the case was originally filed whenever the plaintiff wanted to amend his complaint[,]" which contravened "the policy of judicial economy." Id. Second, the court reasoned that it was "sitting as a Mississippi court[,]" meaning the post transfer defendant "was made party to an action governed by the law of Mississippi." Id.

The Individual Defendants argue that although they "were added to this action after transfer to South Carolina," the court should find they were nonetheless "made parties to an action governed by California law[,]" just as the court did in Riddle. ECF No. 94 at 6. They also contend that Riddle's personal jurisdiction rationale is applicable here as well because this "action was not transferred pursuant to 28 U.S.C. § 1406(a) to cure a jurisdictional . . . defect[;] it was transferred pursuant to § 1404(a) for the parties' convenience." Id. at 4. The Central District of California, consequently, "made no determination that it lacked personal jurisdiction over the parties[ ]" according to the Individual Defendants. Id. (emphasis added). Because it is well-established that the transferee court cannot apply the law of the transferor court unless the transferor court

---

[4] The post-transfer defendant asserted that "what could have been d[id] not matter[ ]" because Virginia was the original forum as to claims filed against it. Riddle, 764 F. Supp. at 423. The Riddle court rejected that view.

could have exercised personal jurisdiction over the defendant,[5] the Individual Defendants appear to argue that applying California's choice of law rules here would not violate that rule because the Central District of California never made a jurisdictional determination and, perhaps, could have exercised personal jurisdiction over them.

In response, UCM distinguishes Riddle, arguing the court applied the law of the transferee court's forum because the Southern District of Mississippi would have had personal jurisdiction over the later-added defendant. ECF No. 95 at 8–9. In contrast to Riddle, UCM claims the Central District of California could not have obtained personal jurisdiction over the Individual Defendants, nor do the Individual Defendants claim as much in their supplemental brief. Id. at 9. UCM further asserts the Individual Defendants' position—that the Central District of California did not determine whether it had personal jurisdiction "over the parties"—is misleading because the Individual Defendants were not parties to this suit while it was pending in California. Id. at 4. Thus, according to UCM, it is not surprising that the Central District of California made no jurisdictional determination as to a non-party. Id.

The parties make additional arguments based on policy and general notions of fairness. The Individual Defendants argue that one rationale underlying the Van Dusen rule—preventing a plaintiff from capturing the laws of a jurisdiction to which a defendant has no connection—actually supports their position. See ECF No. 94 at 5. They reason that it was UCM who selected California as a forum, presumably to capture "whatever advantages it perceived from litigating in that jurisdiction[,]" and so, UCM "cannot now

[5] See Gimer, 948 F.2d 1280 (Table), 1991 WL 237931, at *1; Roofing & Sheet Metal Servs., Inc., 689 F.2d at 991; Ellis, 646 F.2d at 1110; Davis, 580 F. Supp. at 1086; Ianello, 300 F. Supp. 2d at 403; see also supra p. 7.

complain" that California choice of law rules apply. Id. The Individual Defendants therefore believe the "anti-forum shopping" principle cuts in their favor. Id.

UCM argues that it "could just as easily, and still could for that matter, dismiss the Individual Defendants from this action and file a new action in this Court bringing the exact same claim for breach of their non-solicitation agreements." ECF No. 95 at 7. The Individual Defendants, as a result, should not be permitted "to avoid the law of the state they live in because of a prior aspect of this case that did not involve them—and in fact could not involve them for jurisdictional reasons[.]" Id. UCM adds that the Individual Defendants' position is "inconsistent with the law, principles of judicial efficiency, and common sense." Id.

**3. Analysis**

To resolve the issue, the court first returns to Van Dusen. The foremost policy concern animating the Van Dusen rule—i.e., applying the transferor forum's law after a transfer for convenience—was to "ensure that the 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed."[6] See 376 U.S. at 638–39.

Applying the law of the state in which the district court sits usually achieves this goal, see Klaxon, 313 U.S. at 496–97, but Van Dusen recognized that a transfer for the

[6] Forum shopping was not the Court's foremost concern; rather, its rationale was preventing outcomes that would not be possible absent federal jurisdiction, which had the ancillary, beneficial effect of preventing defendants from using a transfer to deprive plaintiffs of their venue privilege. See Van Dusen, 376 U.S. at 635–37 (rejecting the "rather startling conclusion that one might get a change of law as a bonus for a change of venue.") (quotation marks omitted).

sake of convenience required application of the laws "of the State in which the action was filed[ ]" because a transfer to another forum (along with a change in the applicable law) would not be possible absent federal jurisdiction and the existence of Section 1404(a). Id. at 638–39 (concluding that "the critical identity to be maintained is between the . . . court which decides the case" and the "State in which the action was filed."). In other words, without Section 1404(a), there would have been no transfer, and a "federal judicial housekeeping measure," like Section 1404(a), should not authorize anything more than a change of courtrooms. See id. at 636–37.

In this case, Van Dusen's rationale counsels in favor of applying South Carolina's choice of law rules because the opposite outcome—application of California's choice of law rules—could only be achieved due to the "accident" of federal jurisdiction. More concretely, when a plaintiff amends its complaint to add an additional party while a suit is pending in a particular court, all would expect that court (state or federal) to apply the choice of law rules of the state in which it sits. See Klaxon, 313 U.S. at 496–97 The only reason a district court would apply another state's choice of law rules, in this context, would be due to the case having been transferred from another district prior to the filing of the amended complaint. Applying the choice of law rules of the transferor court to a defendant never haled before that court could not be achieved absent a transfer—a transfer only made possible by Section 1404(a), and by extension, the existence of federal jurisdiction. Because this is precisely the outcome that Van Dusen

sought to prevent, the court finds that Van Dusen should not be rigidly applied in a manner that would defeat its underlying rationale.

Subsequent to Van Dusen, the Supreme Court again held that the policy of preserving the law that would be applied absent federal jurisdiction justified retaining the Van Dusen rule after a plaintiff-initiated Section 1404(a) transfer. Ferens, 494 U.S. at 531. The Court acknowledged that its decision would allow a plaintiff to file in a far-off district solely to invoke a favorable law before moving to have the case transferred to a more convenient locale. Id. at 528. Even so, applying the transferor forum's law, the Court explained, does not "give a plaintiff an opportunity to use a transfer to obtain law that he could not obtain through his initial forum selection." Id. at 528. The plaintiff always "has the option of . . . shopping for a forum with the most favorable law[,]" the Court observed, and "diversity . . . did not eliminate these forum shopping opportunities; instead, under Erie, federal courts were required to replicate them." Id. at 527 (cleaned up). As Ferens recognizes, a plaintiff always has the choice of where to initially site their case (and, thus, of the applicable law), provided that the venue selected is a proper one. See id.; see also Myelle, 57 F.3d at 413.

The Z-Rock and Ormond courts recognized that applying their own forum states' laws vindicated the plaintiffs' venue privilege because both had chosen to amend their complaints to add new parties to lawsuits that were pending in those states.[7] See Z-Rock,

---

[7] Even though the plaintiffs in Z-Rock and Ormond resisted application of the transferee forums' laws, that did not change the fact that they had exercised their venue privilege by choosing to initially sue the post-transfer defendants when the suits were pending before the transferee courts. See Z-Rock, 2004 WL 1771569, *5–6; Ormond, 2009 WL 102539, at *4–5. The plaintiffs could just as easily have chosen to file suit against the post-transfer defendants in the transferor courts, whether before or after transfer.

2004 WL 1771569, at *6; Ormond, 2009 WL 102539, at *5. Here, for one reason or another, UCM did not initiate suit against the Individual Defendants until the suit was pending in this court. Because this court is a proper forum, that decision was an appropriate exercise of UCM's venue privilege. See Ormond, 2009 WL 102539, at *5 ("Applying Indiana choice of law principles" to claims against the post-transfer defendant "does not frustrate the plaintiffs' ability to take advantage of the forum where they chose to file their claim."). As such, for the Individual Defendants, this forum is the "original forum." See Lombard,1995 WL 447651, at *2 n.1. To the extent that the Individual Defendants raise concerns of forum-shopping, they complain of an advantage that inheres to every plaintiff as the master of its complaint. See Ferens, 494 U.S. at 527–28; see also Z-Rock, 2004 WL 1771569, at *6 ("As master of their complaint, plaintiffs had the choice of selecting a forum for their original complaint and naming the parties.").

Applying California's choice of law rules, on the other hand, would result in California rules applying to defendants that were never haled before a California court. See Compl. That would, in effect, deprive UCM of its venue privilege and constitute an outcome that could only be achieved due the "accident" of a federal jurisdiction. See Van Dusen, 376 U.S. at 638. The fact that the Individual Defendants were never sued in California underscores the inaptness of applying California's choice of law rules; no court would consider applying the choice of law rules of a forum in a which a defendant had never been sued. See Z-Rock, 2004 WL 1771569, at *5 (finding "no reason to invoke" transferor forum's choice of law rules because the post-transfer defendants "were never subjected[ ]" to suit in the transferor court.) As such, unlike in cases where a Section 1404(a) transfer precedes the transferor court's assessment of personal

jurisdiction over a defendant sued in the transferor court,[8] the court finds the "hypothetical" question of the Central District of California's ability to exercise jurisdiction over a non-party defendant irrelevant.

Lastly, there is still Riddle to consider. The first rationale that court offered for applying the transferor's law to the post transfer defendant was the post transfer defendant's failure to dispute the transferor court's ability to exercise personal jurisdiction over it. Riddle, 764 F. Supp. at 423. For the reasons stated above, the court declines to engage in hypothetical jurisdictional inquiries. And in any event, the Individual Defendants dispense with personal jurisdiction arguments in their supplemental reply. See ECF No. 96. But, they insist that the pair of remaining rationales in Riddle still carry the day for them. ECF No. 96 at 3. The court finds neither justification persuasive.

First, take Riddle's observation that it was inefficient to require the plaintiff to "go back" to the transferor court to re-invoke the choice of law rules of the transferor forum as to post transfer defendants. 764 F. Supp. at 423; but see Ferens, , 494 U.S. at 532 (determining law to be applied after transfer based upon policy concerns of Van Dusen, even where "[e]fficiency might seem to dictate" another rule). Applying the transferor state's law without exception to promote efficiency, however, presumes that the plaintiff wishes to litigate in the transferee court—a venue it did not initially select—and that the plaintiff wishes for the transferee state's law to apply. This case demonstrates that the latter assumption does not always hold true, as UCM wishes to invoke the transferor forum's law. The efficiency rationale, therefore, is not capable of

[8] See supra n.5.

consistent application and assumes too much. Conversely, applying the law of the state in which a plaintiff first brings suit against a defendant—i.e., recognizing a plaintiff's proper exercise of their venue privilege—is a simple and efficient means of determining the law to be applied. See also REC Software USA, 2011 WL 13120813, at *2 (noting that plaintiff's choice of forum is entitled to "substantial deference" in deciding a motion to transfer).

Second, Riddle's other rationale—that the defendant "was made party to an action governed by the law of Mississippi"—is a conclusory statement without any analytical justification. See 764 F. Supp. at 423.

UCM also presents a workaround to the Riddle approach in that it could have filed—and still could file—a separate lawsuit against the Individual Defendants in this district, instead of continuing with its amended complaint. The court is not of the mind that the applicable choice of law rules should turn on the rather arbitrary distinction between an amended complaint and a separate lawsuit.[9] Instead, the court will recognize UCM's exercise of its venue privilege and afford it the benefit of the laws of the jurisdiction where it first filed suit against the Individual Defendants. See Al Shimari, 933 F. Supp. 2d at 799. As such, the court will apply South Carolina's choice of law rules to claims against the Individual Defendants.

**B. South Carolina Choice of Law Analysis**

South Carolina choice of law rules hold that, absent a choice of law provision in the contract, the principle of lex loci contractus determines the substantive law to be

[9] Moreover, it strikes the court as inefficient to require UCM to file a separate lawsuit to exercise its venue privilege.

applied. Team IA, Inc. v. Lucas, 717 S.E.2d 103, 109 (S.C. Ct. App. 2011); see Gourdine v. Karl Storz Endoscopy-America, Inc., 296 F. Supp. 2d 681, 493 (D.S.C. 2016). Under this principle, the governing law is that "of the place where the contract was made." Lucas, 717 S.E.2d at 109. UCM claims the Agreements were entered into in South Carolina. ECF No. 95 at 10. The Individual Defendants do not claim otherwise, see ECF Nos. 85, 88, 94, 96, and the court can plausibly infer from the amended complaint that the Agreements were entered into in South Carolina, see Amend. Compl. ¶¶ 12–19; Iqbal, 555 U.S. at 667. Accordingly, the court will apply the substantive law of South Carolina for purposes of this motion.[10] Having determined that the substantive law of South Carolina applies, the court turns to the merits of the motion to dismiss.

**C. The Individual Defendants' Enforceability Challenge**

As an initial matter, the court will consider the substance of the Agreements even though they are not attached to the amended complaint because they are integral to UCM's breach of contract claim and neither party disputes their authenticity. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (permitting consideration of "document . . . that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity[ ]" when reviewing a motion to dismiss); Transamerica Premier Life Ins. Co. v. Selman & Co., LLC, 401 F. Supp. 3d 576, 590 (D. Md. 2019)

[10] Should discovery reveal that any of the Agreements were entered into in another state, the court will perform an additional choice of law analysis. That possibility is of no concern to the court at the motion to dismiss phase because the court draws all reasonable inferences in UCM's favor, and UCM prefers the substantive law of South Carolina.

(considering contract not attached to complaint in deciding motion to dismiss because the contract was integral to an action for breach of contract).

The Individual Defendants argue the Agreements are facially unenforceable for two reasons. ECF No. 88 at 11–12. First, they claim that the Agreements are unenforceable because they were made "in consideration of Employee's continued employment," without providing for any independent consideration. Id. at 11; ECF No. 86-2. Second, they assert the Agreements are unenforceable because the scope of the non-solicitation provision is too broad. ECF No. 88 at 11. The court considers each argument in turn.

**1. Sufficiency of Consideration**

On their first argument, it is true that the only form of consideration recited in the Agreements is "continued employment." ECF No. 86-2. In opposition, UCM relies on a South Carolina Supreme Court opinion from 1986 to argue that continued employment is sufficient consideration to form a binding contract. ECF No. 95 at 12 (citing Riedman Corp. v. Jarosh, 349 S.E.2d 404, 405 (S.C. 1986) (holding that "a covenant not to compete may be enforced where the consideration is based solely upon the at-will employment itself.")). In reply, the Individual Defendants contend that Riedman Corp. was abrogated in part by the South Carolina Supreme Court's subsequent decision in Poole v. Incentives Unlimited, Inc., 548 S.E.2d 207, 209 (S.C. 2001). ECF No. 96 at 7 n.3.

In Poole, the Court held that "where the employment contract is supported by the purported consideration of continued employment, there is no consideration when the contract containing the covenant is exacted after several years employment and the

employee's duties and position are left unchanged." Poole, 548 S.E.2d at 209 (first emphasis in original). The Individual Defendants focus on the next sentence of the Poole opinion, where the Court "adopt[ed]" the rule "that when a covenant is entered into after the inception of employment, separate consideration, in addition to continued at-will employment, is necessary in order for the covenant to be enforceable." Id. In light of the tension in these two statements, in addition to the fact that Poole concerned a plaintiff who signed a non-compete after three years of employment, the court finds Poole ambiguous as to whether a non-compete agreement signed moments or days after employment began as a part of a continuous onboarding process would be unenforceable. See id. at 208–09.

Even if Poole created a brightline rule requiring non-solicitation agreements to be executed prior to the inception of employment, the court agrees with UCM that the allegations of the amended complaint do not conclusively establish that the Agreements were entered into after the Individual Defendants' employment began. See ECF No. 95 at 18 n.12 (arguing that while the "Individual Defendants claim . . . these agreements were 'post-employment covenants[,] . . . there are no facts of such in the record."). Attempting to show otherwise, the Individual Defendants point to a footnote in UCM's response brief to demonstrate (or at least suggest) that all except one of the Individual Defendants executed the Agreements after their employment began. ECF No. 96 at 7. Footnotes in briefs, however, are beyond the scope of the court's consideration on a motion to dismiss.[11]

[11] The court also notes that the footnote states that "Ms. Page signed the non-solicitation agreement on August 2, 2022 before her employment with UCM began in September 2022." ECF No. 95 at 18 n.5 (citing Amend. Compl. ¶ 12). The footnote

In its amended complaint, UCM alleges either the month that an Individual Defendant began working in their most recent position with UCM or the month that an Individual Defendant began working for UCM more generally. See Amend. Compl. ¶¶ 12–19. The amended complaint also alleges the exact date that each Individual Defendant executed the Agreement. See id. Those dates either (a) precede the month in which an Individual Defendant started with UCM or received a new position; or (b) fall with the same month in which an Individual Defendant started with UCM or received a new position. See id. As such, the allegations in the amended complaint do not conclusively establish that any Agreement was entered into prior to the inception of employment or prior to receiving a new position. See id. Thus, even if Poole created a brightline rule requiring non-solicitation agreements to be executed prior to the start of employment, the Individual Defendants cannot show that such a rule would render the Agreements unenforceable on the face of the amended complaint. See also SmartLinkx Solutions, LLC v. Zeif, 2022 WL 939846, at *11 (D.S.C. Mar. 29, 2022) (assessing Poole's applicability on a motion to dismiss concerning non-solicitation agreement entered into "within months" of employment's inception and denying the motion because plaintiff was entitled to "investigate the proximity in time between when [defendant] was hired and when the NDA was executed"); Rockford Mfg., Ltd. v. Bennet, 296 F. Supp. 2d 681, 690 (D.S.C. 2003) (granting preliminary injunction against defendant employees even where employees submitted evidence that they "did not sign the non-solicitation agreements until a day after they started work[.]").

---

does not speak to whether any other Individual Defendant entered into their Agreements after their employment began.

**2. Scope of Solicitation Prohibition**

Next, the Individual Defendants claim the non-solicitation provision is too restrictive to be enforceable under South Carolina law. See ECF No. 88 at 12–13. The non-solicitation provisions are nearly the same for each of the Agreements:

> During Employee's employment and for a 2 year period thereafter, Employee will not (directly or indirectly) solicit or persuade, or attempt to solicit or persuade, any Employer customer or other person that has an actual or potential business relationship with Employer not to do business with or to cease doing business with, to reduce the amount of business anticipated or historically done with Employer, or to otherwise alter the actual or potential business relationship with Employer.

ECF No. 86-2 at 1–2.[12]

The Individual Defendants concede that South Carolina courts have held that a customer-based restriction in a non-solicitation provision need not contain a geographic limitation. ECF No. 88 at 13. But, when the South Carolina Court of Appeals approved of a non-geographically limited restriction, it specifically held—and the Individual Defendant emphasize—that it was "[p]rohibitions against contacting existing customers" that can serve as "a valid substitute for a geographic limitation." Wolf v. Colonial Life and Acc. Ins. Co., 420 S.E.2d 217, 222 (S.C. Ct. App. 1992) (emphasis added); see ECF No. 88 at 13. The Individual Defendants therefore argue that the Agreements do not comport with Wolf because they apply to "any Employer customer or other person that has an actual or potential business relationship with Employer[.]" See ECF Nos. 86-2 at 1–2 (emphasis added), 88 at 13. Since "potential business relationship" is not defined,

[12] Two of the Agreements impose a three-year restrictive period. ECF No. 86-2 at 9–10.

the Individual Defendants submit that the phrase "can mean virtually anything, and [include] any entity." ECF No. 88 at 13.

UCM counters that the Agreements need not contain a geographical limitation because they do not inhibit the Individual Defendants ability to work for direct competitors. ECF No. 95 at 12, 18 (citing Rockford Mfg., 296 F. Supp. 2d at 689–90 (finding non-solicitation restrictions to not be "unduly harsh" because defendants could "still solicit business anywhere.")).

The Individual Defendants' argument proves too much for a motion to dismiss. First, while the non-solicitation provision covers a "customer or other person" who has a "potential business relationship with [UCM,]" the actual restriction is only triggered when the Individual Defendants, "directly or indirectly[,] solicit or persuade, or attempt to solicit or persuade," a person with whom UCM has a potential business relationship, "to reduce the amount of business anticipated or historically done with [UCM], or to otherwise alter the actual or potential business relationship with [UCM]." ECF No. 86-2 at 1–2. Because the provision only precludes the Individual Defendants from reducing the amount of business conducted with UCM or from otherwise altering a potential business relationship with UCM, the scope of the prohibition is arguably more limited than the Individual Defendants contend. Because the provision is susceptible to varying interpretations that could bear on its validity, a determination that the provision is unenforceable as a matter of law is not appropriate on a motion to dismiss. See 1899 Holdings, LLC v. 1899 Liab. Co., 568 F. Appx. 219, 224 (4th Cir. 2014) ("In a contract dispute, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.") (internal quotation marks

omitted); Martin Marietta Corp. v. Int'l Telecomm. Satellite Org., 978 F.2d 140, 143 (4th Cir. 1992) (reversing district court's grant of motion to dismiss because the disputed contract language was "not free of ambiguity"); Hardwire LLC v. Goodyear Tire & Rubber Co., 360 F. Supp. 2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

Second, although Wolf explicitly held that prohibitions against "contacting existing customers" was a "valid substitute for a geographic limitation[,]" 420 S.E.2d at 222, it did not provide any guidance on provisions, like the one here, that prohibit certain types of contact with those having a potential business relationship with the employer. Because South Carolina's appellate courts have not spoken directly to the enforceability of non-solicitation provisions like those in the Agreements, they are not conclusively unenforceable under South Carolina law. While the court can resolve unsettled questions of state law on a motion to dismiss, the court declines to do so here given the ambiguity of the non-solicitation provision's scope. See Ellsworth v. Infor Global Sols. (Mich.) Inc., 2012 WL 6641648, at *4 (D.S.C. Dec. 20, 2012) (declining to resolve novel issue of state law on motion to dismiss).

Finally, the court notes that the Individual Defendants' enforceability challenges are affirmative defenses, which should only be reached on a motion to dismiss in the "relatively rare circumstances" where "all facts necessary to the affirmative defense clearly appear on the face of the complaint." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007); see Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 462 (M.D.N.C. 2016) (noting that affirmative defense should only be reached on a motion to

dismiss "in rare circumstances," and denying a motion to dismiss asserting an "affirmative contractual defense[.]"); see also see also Martin, 980 F.2d at 952 ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). The preceding analysis shows that the enforceability of the Agreements requires resolution of ambiguities, close factual questions, and unsettled legal questions—none of which are apt for resolution on a motion to dismiss, especially where an affirmative defense is the basis for the motion. As such, the court will deny the motion.

## IV. CONCLUSION

For the reasons set forth above, the court **DENIES** the Individual Defendants' motion to dismiss UCM's breach of contract claims, ECF No. 85.

**AND IT IS SO ORDERED.**



**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 20, 2026**
**Charleston, South Carolina**